UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2021 MAR 31 PM 2:21

EDWARD H.,

    Plaintiff,

v.

Case No. 2:19-cv-00180-cr

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

**OPINION AND ORDER
GRANTING PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, DENYING THE COMMISSIONER'S MOTION TO AFFIRM,
AND REMANDING FOR FURTHER PROCEEDINGS**
(Docs. 6 & 8)

Plaintiff Edward Harrington ("Plaintiff") brings this action for Title II Social Security Disability Insurance Benefits ("DIB") under the Social Security Act ("SSA"). Plaintiff moves to reverse the decision of the Social Security Commissioner (the "Commissioner") that he is no longer disabled pursuant to 42 U.S.C. § 405(g), asserting that Administrative Law Judge Tracy LaChance (the "ALJ") erred by inadequately developing the record with regard to his upper extremity limitations in light of his status as a self-represented claimant. (Doc. 6.) He also asserts that the Appeals Council erred in denying his request that additional evidence of his lower extremity limitations be considered. He seeks a remand for a further hearing. The Commissioner moves to affirm. (Doc. 8.)

Plaintiff is represented by Craig A. Jarvis, Esq. Special Assistant United States Attorneys Hugh Dun Rappaport and Joshua L. Kershner represent the Commissioner.

I.  **Procedural Background.**

On September 17, 2008, the Commissioner found that Plaintiff was disabled beginning on October 1, 2007 in a comparison point decision ("CPD") which serves as the benchmark to determine whether Plaintiff's condition has improved so that he is no

longer disabled. Plaintiff remained disabled and eligible for benefits pursuant to the September 17, 2008 decision until February 24, 2017, when the Commissioner issued a Notice of Disability Cessation informing Plaintiff that it determined his health had improved and that his disability status ended in March 2017. Plaintiff continued to receive benefits until May 2017.

On March 20, 2017, Plaintiff filed a request for reconsideration of the disability cessation decision and on June 13, 2017 a video teleconference disability hearing was conducted before SSA Claims Representative Frederica Schneider and Disability Hearing Officer Kristina Burbank. On June 28, 2017, a Disability Hearing Officer's Decision concluded that Plaintiff was not disabled.

Plaintiff requested a hearing and on March 23, 2018 an administrative hearing was held before ALJ LaChance at which Plaintiff was self-represented. He sought representation but was advised by the attorneys he contacted that they would not represent him without a retainer which he could not afford. Plaintiff testified at the hearing, as did a medical expert and a vocational expert. The ALJ issued an unfavorable decision on June 14, 2018, which stands as the Commissioner's final decision.

## II. The ALJ's Application of the Eight-Step, Sequential Framework.

To determine whether a plaintiff continues to be disabled[1] and remains eligible for DIB benefits, the Commissioner uses an eight-step sequential framework:

(1) Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section).

(2) If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). "The definition of 'disabled' is the same for purposes of receiving [DIB] and SSI benefits." *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

2

appendix 1 of this subpart? If you do, your disability will be found to continue.

(3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).)

(4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section; i.e., whether or not there has been an increase in the residual functional capacity [("RFC")] based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).

(5) If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step (6). If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

(6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521). This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function. If the [RFC] assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7). When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

(7) If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 404.1560. That is, we will assess your [RFC] based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

(8) If you are not able to do work you have done in the past, we will consider whether you can do other work given the [RFC] assessment made under paragraph (f)(7) of this section and your age, education, and past work experience (see paragraph (f)(9) of this section for an exception to this rule). If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.

(9) We may proceed to the final step, described in paragraph (f)(8) of this section, if the evidence in your file about your past relevant work is not sufficient for us to make a finding under paragraph (f)(7) of this section about whether you can perform your past relevant work. If we find that you can adjust to other work based solely on your age, education, and [RFC], we will find that you are no longer disabled, and we will not make a finding about whether you can do your past relevant work under paragraph (f)(7) of this section. If we find that you may be unable to adjust to other work or if § 404.1562 may apply, we will assess your claim under paragraph (f)(7) of this section and make a finding about whether you can perform your past relevant work.

20 C.F.R. § 404.1594(f)(1)-(9).

At Step One, the ALJ determined that Plaintiff has not worked since the alleged onset date. At Step Two, she found that Plaintiff has severe impairments of degenerative disc disease, obstructive sleep apnea, carpal tunnel syndrome, and depression.

At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of an impairment listed in the SSA regulations, and specifically considered Listing 1.04 for disorders of the spine, Listing 1.08 for soft tissue injury, Listing 3.00 for respiratory disorders, Listing 11.14 for peripheral neuropathy, and Listing 12.04 for bipolar and related disorders.

At Step Four, the ALJ found medical improvement occurred by March 1, 2017 because at a mental psychological consultative examination Plaintiff "reported that his depression was controlled with medication, and he did not report any mental health limitations when asked about his inability to work." (AR 59.) Plaintiff also reported "engaging in more activities when compared to the CPD, such as helping his son get ready for school, engaging in household chores he was physically able to do, driving, working on bills and finances with his girlfriend, and even going hunting with friends." *Id.*

4

ALJ LaChance found Plaintiff's decreased medical impairment affected his ability to do work and thus omitted Step Five. At Step Six, she concluded that Plaintiff continued to have a severe impairment or combination of impairments based on his degenerative disc disease, obstructive sleep apnea, carpal tunnel syndrome, and depression. At Step Seven she found that although severe, Plaintiff's medical impairments decreased in medical severity to the point where he had an RFC to perform light work as follows:

> lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; he can never climb ladders, ropes, or scaffolds; he can occasionally climb ramps and stairs; he can occasionally balance, stoop, kneel, crouch, and crawl; and occasionally perform overhead reaching. He is limited to simple tasks with only occasional changes in routine, no fast-paced production standards, and occasional interaction with general public.

*Id.*

At Step Eight, the ALJ concluded that given Plaintiff's age, education, work experience, and RFC, he could perform a significant number of jobs in the national economy, including office helper, mail clerk, and fruit distributor. Accordingly, the ALJ found that Plaintiff's disability ended on March 1, 2017, and that he had not become disabled again since that date.

### III. Conclusions of Law and Analysis.

#### A. Standard of Review.

The court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (internal quotation marks and citation omitted). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). Even where "substantial evidence supporting the claimant's position . . . exists[,]" the ALJ's decision must be upheld if the record also contains substantial evidence to support a contrary conclusion. *Jones v. Berryhill*, 415 F. Supp. 3d 401, 411 (S.D.N.Y. 2019) (citation omitted). "It is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks, brackets, and citation omitted).

### B. Whether the ALJ Adequately Developed the Record When Considering the Appeal of a Self-Represented Claimant.

Plaintiff asserts that the ALJ should have developed the medical record to resolve inconsistencies regarding the extent of his upper extremity impairments. He argues that the ALJ's duty was heightened because he was not represented by counsel and that the ALJ should have:

> pointed out that [Michael Kenosh, MD] had given an opinion on final disability and not on the Plaintiff's limitations. She should have given the Plaintiff an opportunity to have Dr. Kenosh, [Drinnon A. Hand, MD], or both comment on his limitations rather than proceeding only with a statement about final disability from Dr. Kenosh. Alternatively, she could have also called a medical expert to testify about the medical questions that are left open by the record.

(Doc. 6 at 7.) The Commissioner counters that Plaintiff fails to explain how additional comments by either Dr. Kenosh or Dr. Hand would affect the disability determination.

"It is the rule in our circuit that the . . . ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks, omissions, and alterations omitted); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (observing that an ALJ has an obligation to develop the record because "of the non-adversarial nature of . . . benefits proceedings"); *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d

6

Cir. 1982) (noting that "the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record"). "This duty exists even when the claimant is represented by counsel[,]" *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996), but "[w]hen a claimant properly waives his right to counsel and proceeds *pro se*, the ALJ's duties are heightened." *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) (internal quotation marks omitted). This heightened duty requires the ALJ "'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts[.]'" *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Gold v. Sec'y of HEW*, 463 F.2d 38, 43 (2d Cir. 1972)); *see also Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) ("The ALJ has a duty to adequately protect a *pro se* claimant's rights").

An ALJ also has a duty to resolve "gaps in the administrative record[.]" *Hankerson*, 636 F.2d at 897 (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)); *see also Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("In light of the ALJ's affirmative duty to develop the administrative record, an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.") (internal quotation marks omitted). The Second Circuit has emphasized that, "[i]n such cases where the claimant was handicapped by lack of counsel at the administrative hearing, the reviewing court has a duty to make a searching investigation of the record to ensure that the claimant's rights have been adequately protected." *Hankerson*, 636 F.2d at 895 (internal quotation marks omitted).

On February 2, 2017, state agency consultative examiner Alan Lilly, MD, conducted a physical examination of Plaintiff wherein Plaintiff reported his two "major . . . difficulties . . . are depression . . . and secondly sleep apnea." (AR 1216.) He also reported "[o]ther problems . . . includ[ing] ongoing difficulty with his back, both in his neck and low back. . . . [S]tat[ing] that he does have some difficulty into his neck but no difficulty in the shoulders or arms." *Id.* Plaintiff explained that "he now does odd jobs at home. He is able to drive a lawnmower and activities such as that and will do some lifting and bending." *Id.* Following a physical examination, Dr. Lilly noted that Plaintiff had "some mild stiffness in the fingers, but other than that the hands and fingers are

completely within normal limits"; "[f]ull range of motion"; "[e]xcellent grip strength"; and that "[h]e is certainly able to perform fine and gross motor activities." (AR 1217.)

On February 22, 2017, Plaintiff's lumbar and thoracic spine were x-rayed. Donald Swartz, MD, reviewed these x-rays and noted with regard to the lumbar spine x-ray that there were "[m]ild degenerative disc changes of the lower lumbar spine." (AR 1238.) As for the thoracic spine x-ray he noted "[m]inimal degenerative changes of the thoracic spine." (AR 1236.) On the same day, Geoffrey Knisely, MD, reviewed Plaintiff's then-existing medical records and Plaintiff's statements and concluded that Plaintiff's medical impairments had improved since the CPD and that he could perform light work.

On March 28, 2017, treating medical examiner Andrew Newman, PA, examined Plaintiff who reported chronic neck pain, bilateral cervical radicular syndrome, and numbness in both hands, including a six to seven year history of neck pain with no "inciting event." (AR 1243.) Plaintiff reported "constant pain in the neck and upper back with radiating pain into both arms with numbness and tingling in the hands. . . . It is worse with driving. It is worse at night. . . . His neck pain is worse with overhead work. . . . He states his hands seem to be the biggest issue currently." (AR 1243-44.) PA Newman noted that Plaintiff had no recent treatment for his neck pain and reviewed a magnetic resonance imaging ("MRI") report from May 2011 that "showed a right foraminal dis[c] herniation at C6-C7 of the extrusion type than impinged the right C7 nerve root. There was marked dis[c] degeneration at C3-C4." (AR 1245.) Upon reviewing an x-ray of Plaintiff's lumbar spine from February 2017, PA Newman noted mild degenerative disc changes and after reviewing an x-ray of Plaintiff's thoracic spine from that same month, he again noted minimal degenerative change. PA Newman recommended a new MRI of Plaintiff's cervical spine and an electromyogram ("EMG") of "both upper extremities." (AR 1246.) The MRI revealed "[m]ultilevel disc degenerative changes as noted with mild bulging but no focal protrusion. Multilevel foraminal encroachment bilaterally as noted. Borderline central canal stenosis at C5-6 and C6-7." (AR 1250.)

8

On April 17, 2017, Plaintiff met with PA Newman and Dr. Kenosh in a shared office visit during which they reviewed the April 11, 2017 EMG. Dr. Kenosh authored the report from this visit and noted the EMG "was remarkable for bilateral median nerve entrapment neuropathy at the wrist. Findings were symmetric and graded as mild. There is no upper extremity radiculopathy or ulnar nerve entrapment neuropathy." (AR 1260.) He further observed that the "[p]hysical exam show[ed] normal upper extremity reflexes, strength and no APB atrophy." *Id.* Dr. Kenosh's diagnostic impressions were that Plaintiff had bilateral cervical radicular syndrome and bilateral carpal tunnel syndrome, but he stated "I do not honestly see anything concerning in my read of the Radiology report, but I would like to look at his images before I give my final impression. His electrodiagnostic study shows mild carpal tunnel[]" (AR 1261) and recommended bilateral carpal tunnel corticosteroid injections for diagnostic and therapeutic purposes. The ALJ cited this evidence as indicating that "both treating providers noted that there was nothing concerning on the claimant's MRI and recommended that he undergo carpal tunnel injections[.]"(AR 70.)

On April 18, 2017, Plaintiff met with his treating physician, Dr. Hand, and reported "years of worsening numbness tingling points to 4th-5th fingers and . . . medial hand and arm[,]" and noted "left is worse and right describes as achy pain numbness tingling." (AR 1230.) Dr. Hand noted that Plaintiff's "grip strength is good bilateral as well as reduction of the fingers decreased sensation 4/5 fingers." (AR 1231.) In the assessment portion of his notes he wrote "[u]lnar neuropathy" and stated that Plaintiff would be referred to a hand surgeon and undergo an EMG. *Id.* That same month, Plaintiff received bilateral carpal tunnel corticosteroid injections. In a follow-up appointment with PA Newman and Dr. Kenosh on May 22, 2017, he stated that the injections "did help for about a week with pain and numbness and tingling in his forearms and hands. He estimates 30% to 40% improvement, but the symptoms have returned. He describes a daily aching and throbbing sensation in both forearms with pins and needles in his hands." (AR 1285.) PA Newman and Dr. Kenosh recommended a cervical epidural steroid injection which Plaintiff received on June 22, 2017. In July 2017, he reported that

he was "worse after his cervical epidural steroid injection with [a] new complaint of numbness and tingling in the plantar aspect of both feet." (AR 1302.) PA Newman and Dr. Kenosh discussed an acupuncture trial for Plaintiff's chronic pain and discouraged a surgical evaluation as he was not a surgical candidate. They acknowledged that Plaintiff had explored most treatment options and they had nothing more to offer him.

In May 2017, consultative examiner Rebecca Winokur, MD, reviewed Plaintiff's medical records, quoted Dr. Kenosh as stating "between his electrodiagnostic study and his cervical imaging, I do not see a disabling condition[,]" (AR 1272) (internal quotation marks omitted), and concluded that a recent MRI and EMG suggested mild carpal tunnel disease and that the medical record did not support any significant impact on Plaintiff's functional capacity.

ALJ LaChance assigned Dr. Lilly's opinion "great weight" and noted that despite Plaintiff's issues with his back, neck, and hands, he "was still able to move around quite well and that he could still perform fine and gross motor movements." (AR 72.) She also assigned "great weight" to the opinion of Dr. Knisely who reviewed Plaintiff's medical records in February 2017 and concluded that he could perform light work. She assigned less weight to Dr. Winokur's opinion that Plaintiff could perform medium work with certain exceptions because Dr. Winokur did not adequately consider Plaintiff's subjective reports of pain and fatigue.

ALJ LaChance did not assign any particular weight to the remaining opinions in the record but noted that:

> In terms of his hand symptoms, while the claimant's EMG study revealed evidence of mild carpal tunnel syndrome, it ruled out evidence of cervical radiculopathy symptoms. Although the claimant has evidence of reduced sensation in his fingers and he has reportedly failed injection treatment, his treating providers note that he is not a surgical candidate and he continues to have full upper extremity strength as well as good grip strength and an ability to make a fist. Finally, his treating providers have consistently recommended that the claimant exercise as the primary treatment for his conditions, and as of July 2017, the claimant reported that he had been exercising on a stationary bike.

(AR 65.)

Against this backdrop, Plaintiff asserts the ALJ had a duty to seek a medical clarification from either his treating physician or a medical consultant regarding inconsistent medical evidence created by his self-reports. ALJ LaChance, however, adequately developed the record with regard to Plaintiff's claims of upper extremity impairment by reviewing the treating source records from Drs. Hand and Kenosh and PA Newman and the consultative examiner reports of Drs. Lilly, Winokur, and Knisely. Although Dr. Kenosh and PA Newman provided no opinion regarding Plaintiff's upper extremity limitations, nothing contained in their opinions conflicts with Plaintiff's RFC. The ALJ credited Plaintiff's subjective reports of pain and fatigue and imposed upper extremity limitations based on those self-reports.

With regard to Plaintiff's testimony, ALJ LaChance noted that "[h]e testified that his hands and arms go[] numb when he drives and that h[e] has difficulty lifting things because he cannot feel what he is lifting." (AR 63.) The ALJ concluded:

> After considering the evidence of record, the undersigned finds that the [Plaintiff's] medically determinable impairments could have reasonably been expected to produce the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the objective medical and other evidence . . . . Accordingly, these statements have been found to affect the [Plaintiff's] ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.

*Id.* The ALJ further noted that Plaintiff performed "some household chores, driving, watching television, helping his girlfriend with finances, and going shopping[,]" (AR 65), and that Plaintiff had not received consistent treatment for his lower back or neck pain since the CPD, had full range of motion in his upper extremities as well as excellent grip strength, and had the ability to perform fine and gross motor movements.

The ALJ considered the opinions of three treating medical professionals and four state agency consultative examiners, each of whom noted Plaintiff's self-reports of upper extremity impairment. She reviewed x-rays of Plaintiff's cervical and lumbar spine; an MRI and EMG of his cervical spine; the attempted treatment for carpal tunnel through bilateral corticosteroid injections; and the suggested treatment protocol, which included

11

acupuncture and physical exercise. No medical opinion contained in the record supports a conclusion that Plaintiff was more limited than his RFC. The ALJ's determination that Plaintiff's claims were not entirely consistent with the objective medical evidence was supported by substantial evidence and cannot be disturbed on appeal even if the court might reach a different conclusion. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (holding "[w]here an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner").

Because the ALJ adequately developed the record and no material evidence was missing from her disability determination, Plaintiff's motion to reverse based on the ALJ's alleged failure to adequately develop the record is DENIED.

### C. Whether the Appeals Council Improperly Denied Plaintiff's Request to Review New Evidence of his Lower Extremity Limitations.

Plaintiff argues that the Appeals Council erred by failing to consider new evidence he submitted after the ALJ rendered her decision, including an MRI of his lumbar spine taken November 19, 2018 which revealed:

> Degenerative disc and facet changes at L4-5 with grade 1 spondylolisthesis and marked central canal stenosis. . . . Marked foraminal stenosis on the [right] at L4-5 secondary to encroachment of disc protrusion and facet osteophyte with mild impingement on the [right] L4 nerve root. There is a milder degree of foraminal stenosis on the [left]. . . . Central/[right] foraminal disc protrusion at L4-5 which contributes to both central and foraminal stenosis.

(AR 20.) He also submitted December 20, 2018 treatment notes from Matthew Zmurko, MD, who reviewed the November 2018 MRI and noted, among other things, that:

> [Plaintiff] ambulates with a fairly normal reciprocating gait pattern. He can do heel and toe raises, he can do a partial squat. He can forward flex to his mid shins, extend back about 5 degrees. Extension reproduces some discomfort across the small of his back. He can do a deep squat. He has 5/5 motor strength on his bilateral quadriceps, dorsiflexors, EHL, and gastrocnemi[us]. Sensation is grossly intact to light touch. His reflexes are physiologic and symmetric at the patella and Achilles. He has no clonus bilaterally. Negative straight leg raise while seated bilaterally. No

12

> significant groin pain with internal or external rotation [of] his hips. He has no calf pain bilaterally. Good palpable distal pulses.
>
> He had an MRI done at Southwestern Vermont Medical Center dated November 19, 2018. This demonstrated some degenerative changes, most prominent at the L4-L5 level. There is a slight spondylolisthesis. There is some facet arthropathy with some increased fluid signal within the facet joints at the L4-L5 level. There is a right dis[c] protrusion that appears to be effacing the traversing right L5 nerve root. There is some moderate-to-severe stenosis secondary to facet arthropathy and ligamentum hypertrophy, and dis[c] protrusion at the L4-L5 level. Radiographs taken today consist of AP and lateral of the lumbar spine, which show some age-appropriate degenerative changes, mostly at the L4-L5 level with a vacuum phenomena. There is also a spondylolisthesis there. There is some accentuation with flexion motions.

(AR 9.) Dr. Zmurko recommended a "right L4-L5 transforaminal lumbar interbody fusion to decompress the neural elements, help with leg pain and secondarily help with back pain." (AR 10.) The Appeals Council found that "[t]he additional evidence does not relate to the period at issue[]" because it did not "affect the decision about whether [Plaintiff was] disabled beginning or before June 14, 2018." (AR 2.)

Plaintiff asserts that the November 2018 MRI relates to the relevant period because the onset of symptoms occurred before the ALJ rendered her decision. He cites his July 2017 report to PA Newman that he began to experience new symptoms of numbness in his feet. At the ALJ's hearing, he testified that he had lower back problems that required him to wear a brace and limited his ability to sit and stand. He contends that the "MRI shows the end result of a degenerative process that would have developed over several years." (Doc. 6 at 8.)

The Appeals Council must receive new evidence following an ALJ's decision if the evidence is "new, material, and relates to the period on or before the date of the [ALJ's] decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5); *see also Perez*, 77 F.3d at 45 ("The regulations require the Appeals Council to 'evaluate the entire record including the new and material evidence submitted . . . [and] review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the

13

evidence currently of record.'") (alterations in original) (quoting 20 C.F.R. § 404.970(b)). Evidence is material if it is "relevant to the claimant's condition during the time period for which benefits were denied[.]" *Mauro v. Comm'r of Soc. Sec. Admin.*, 746 F. App'x 83, 84 (2d Cir. 2019). If the evidence was likely to have existed during the relevant time period because it reflects a degenerative process, it may be deemed relevant to the period at issue. *See Kemp v. Weinberger*, 522 F.2d 967, 969 (9th Cir. 1975) (remanding to consider medical reports generated after ALJ's decision when claimant's present condition "is the result of a degenerative process"); *Minor v. Astrue*, 2010 WL 3294411, at *4 (D. Md. Aug. 20, 2010) (holding that medical records created after plaintiff's date last insured were relevant to her claim because her "condition was not due to an accident postdating her [date last insured], for example, but was based on" an earlier diagnosis).

In this case, although the evidence post-dates the ALJ's decision, it relates to the disability period which began on March 1, 2017 and continued through the ALJ's June 14, 2018 decision. In March 2017, an x-ray of Plaintiff's lumbar spine revealed "[m]ild degenerative disc changes of the lower lumbar spine" and "[n]o evidence for spondylolysis or spondyliosthesis." (AR 1220.) The November 2018 MRI, in contrast, reflects significant changes in the same area of Plaintiff's spine and supports his claim of "numbness and tingling in the plantar aspect of both feet that is a constant, daily, aching, associated with weakness and worse with bending, sitting, standing, and walking[]" which began in July 2017. (AR 1301.) Additional lumbar spine degenerative changes observed only five months after the ALJ issued her decision are therefore likely to have been present during the relevant period. *See Pollard v. Halter*, 377 F.3d 183, 194 (2d Cir. 2004) (requiring remand where new evidence "may identify additional impairments which could reasonably be presumed to have been present") (internal quotation marks and citation omitted).

With regard to whether there is a reasonable probability that this evidence would change the outcome of the disability determination, the ALJ concluded that, although severe, Plaintiff's degenerative disc disease did not meet the requirements for Listing 1.04 because:

14

> there is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). While imaging reveals evidence of degenerative changes, particularly in the claimant's cervical spine, objective examination shows that the claimant has full strength in the upper and lower extremities, no evidence of motor atrophy, generally normal range of motion, and negative straight leg raise testing. There is also no evidence of arachnoiditis or lumbar spinal stenosis resulting in the inability to ambulate effectively.

(AR 56) (citations omitted). She also discounted Plaintiff's foot pain and numbness in part because he was not seeking active treatment for that impairment and because his treating physicians and medical personnel repeatedly recommended physical exercise as a treatment. The ALJ did not consider Plaintiff's allegations of foot numbness and pain in rendering her RFC determination.

The November 2018 MRI provides objective clinical support for Plaintiff's claims of severe degenerative disc disease because, among other things, it notes "moderate-to-severe stenosis" and "dis[c] protrusion at the L4-L5 level[]" as well as "a right dis[c] protrusion that appears to be effacing the traversing right L5 nerve root." (AR 9.) The ALJ observed this type of evidence was absent in her unfavorable decision. It also negates the ALJ's finding that Plaintiff did not seek treatment for the degenerative changes in his cervical and lumbar spine since the CPD because, as a result of his November 2018 lumbar spine MRI, Dr. Zmurko recommended, and Plaintiff underwent, spinal surgery. Given the lack of objective medical evidence in the record before the ALJ regarding Plaintiff's lumbar spine impairment, there is a reasonable probability that this new evidence would have influenced her decision regarding whether Plaintiff had further RFC limitations or was disabled.

Because Plaintiff's post-decision evidence was new, material, and had a reasonable probability to change the outcome, his motion to reverse the decision of the Commissioner is GRANTED.

15

### D.     The ALJ's RFC Determination.

Although Plaintiff does not raise this as a ground for remand,[2] ALJ LaChance gave "great weight" to the opinion of Gregory Korgeski, Ph.D., "an expert in psychology [who] based his assessment on his actual examination of" Plaintiff (AR 67) and who opined that Plaintiff "may have some adaptation issues" given his "chronic pain and sleep apnea, if he were required to return to work suddenly." (AR 65.) To address Dr. Korgeski's "further suggest[ion] . . . that returning to work could affect [Plaintiff's] control over his depression[,]" the ALJ added "simple tasks, minimal workplace changes, no fast paced work, and limited public contact[]" to Plaintiff's RFC. (AR 67.) However, Dr. Korgeski did not recommend those limitations to address the return to work problems he identified nor does it appear that these limitations would address his concerns. Instead, he opines that "[g]iven [Plaintiff's] pain issues and sleep issues, I suspect that if he were to suddenly be faced with the need to try to function in a work setting, the current level of control over his depression would be significantly tested." (AR 1213.) Although the ALJ gave Dr. Korgeski's opinion "great weight," she failed to address this portion of his opinion or ask what limitations, if any, would render Plaintiff's return to work possible.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion to reverse the decision of the Commissioner (Doc. 6) is GRANTED, the Commissioner's motion to affirm (Doc. 8) is DENIED, and the case is REMANDED for proceedings consistent with this Opinion and

---

[2] *See Womack v. Astrue*, 2008 WL 2486524, at *5 (W.D. Okla. June 19, 2008) ("This [c]ourt generally decides appeals under the Social Security Act by considering the issues raised and argued in a plaintiff's brief. Courts are not required to guess as to grounds for an appeal, nor are they obliged to scour an evidentiary record for every conceivable error. But a reviewing court may not, on the other hand, 'abdicate its traditional judicial function, nor escape its duty to scrutinize the record as a whole to determine whether the conclusions reached are reasonable, and whether the hearing examiner applied correct legal standards to the evidence.'") (citation omitted) (quoting *Bridges v. Gardner*, 368 F.2d 86, 90 (5th Cir.1966)); *Mangan v. Colvin*, 2014 WL 4267496, at *1 (N.D. Ill. Aug. 28, 2014) ("Even if the government had not raised it, a reviewing court may *sua sponte* address issues in social security cases."); *Pastrana v. Chater*, 917 F. Supp. 103, 107 n.2 (D.P.R. 1996) ("The importance of assuring the fair administration of the social security system is a sufficiently important concern to justify the Court's *sua sponte* consideration of the ALJ's bias.").

16

Order.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 31st day of March, 2021.

Christina Reiss, District Judge
United States District Court